942 So.2d 571 (2006)
STATE of Louisiana, Appellee,
v.
Richard BURNHAM, Appellant.
No. 41,146-KA.
Court of Appeal of Louisiana, Second Circuit.
October 11, 2006.
*572 Annette Fuller Roach, Louisiana Appellate Project, Lake Charles, for Appellant.
Paul J. Carmouche, District Attorney, Catherine M. Estopinal, Edward M. Brossette, Assistant District Attorneys, for Appellee.
Before BROWN, STEWART, and DREW, JJ.
BROWN, Chief Judge.
Defendant, Richard Burnham, was convicted at a bench trial of aggravated rape, a violation of La. R.S. 14:42, and sentenced to life imprisonment at hard labor without benefit. Defendant has appealed his conviction. For the reasons set forth below, both defendant's conviction and sentence are affirmed.

Facts
An indictment charges that on February 8, 2003, at approximately 4:00 a.m., defendant raped his girlfriend's 11-year-old daughter. The victim testified at trial that the videotape of her statement made at the Gingerbread House was an accurate depiction of the events that occurred on that date. During the interview, the victim said that defendant, who was dressed in a white robe, came into her room while it was dark, stripped her clothes off, put lotion on her "private" and "stuck his self" in her. The victim specified that defendant put "his thing" inside her "private" multiple times and that it hurt. The victim told the interviewer that Glenn Wiggins, another resident of the household, entered the room while defendant was naked on top of her to ask about the "bumping noise." The victim stated that she tried to push defendant off but that he held her tight and covered her mouth so that she would not scream. The victim stated that defendant stopped when Wiggins entered the room and "faked like he was getting some covers" for her cousin. The victim told the interviewer that her mother was at the hospital with her grandmother when the incident occurred. The victim said that after the assault she bled from her "private," wiped herself with tissue, threw the tissue away, dressed again, and went back to sleep. The victim said that Wiggins asked her about the incident the next day and "they" (either Wiggins or Wiggins and his girlfriend, Valerie Brooks) told the victim's mother about the assault. Her mother called the police immediately after seeing the blood in the victim's underwear.
At trial, the victim testified that defendant came to her bed and covered her mouth with his hand. She identified the green panties introduced into evidence as hers and stated that she wore them that night. The victim stated that she asked Wiggins for help when he came into the room and that Wiggins never saw defendant naked because defendant "jumped out the bed and put his robe on and said he was getting some covers." The victim agreed with defense counsel that her earlier statement that Wiggins had seen defendant in bed with her naked was not true. The victim testified that she took her panties off at the hospital where they were put into a bag. The victim then stated that her mother called her a bad name at the hospital, but she didn't know why.
The child's mother testified that defendant had been her boyfriend at the time of the incident. The mother stated that she found blood in her daughter's panties and on the child's vagina. The mother said *573 that her daughter had not yet begun her menstrual cycle. The mother testified that she called 911 and reported the incident, and the tape of that call was admitted into evidence. The mother said that she had been at the hospital with her grandmother during the assault, and that Valerie Brooks told her about the rape when she got home. The mother testified that Glenn Wiggins told her that he had walked into the victim's room and found defendant leaning over the bed "like he was looking for some clothes" before running out. The mother also testified that the green panties belonged to her daughter, that she did not share underwear with her daughter, that she and her daughter wore different sizes, and that the mother did laundry for the household. She said that she gave the panties to the detective when asked and that the detective "put them in a bag." The mother said that her daughter had never had male visitors at the house and did not remember calling her daughter a "little bitch" at the hospital.
The parties stipulated at trial that Joanne Lawler, the nurse who examined the victim, would have testified that the victim was bleeding from her vagina, that there was no damage to the anus, that her hymen was intact, and that "this would be consistent with rapes of this nature." Detective Paula Moreno stated that authorities could not perform a rape kit because of the time lapse between the event and reporting and because the victim was a child. Detective Moreno said that she asked the mother to bring the child's underwear to the interview conducted at the Gingerbread House. Detective Moreno stated that she did not collect the tissue the victim used to wipe herself or the lotion used by defendant. She did collect the robe worn by defendant but it was not examined for blood stains.
Detectives Moreno and Eric Miles interviewed defendant, who denied the charge, said that he had "busted" the victim having sex "many times" with young boys in the weeks or months before the present offense, and stated that the "bumping noise" that Glenn Wiggins heard was the "cold hinge" making noise when defendant entered the victim's bedroom. Defendant told police that he went into the victim's bedroom to get a sheet because it was cold and to cover Marcus Jenkins, who was sleeping on the couch. In his statement, defendant also stated that the victim "ain't too stable." Detective Moreno testified that she was unable to locate Jenkins, who defendant claimed was in the house at the time of the offense. Detective Moreno interviewed Wiggins, who said that he heard noises from the victim's bedroom but did not witness the rape.
Wendy Westermann testified that she conducted the interview with the victim at the Gingerbread House, that she and the victim drew a picture of the victim's family, and that the victim used the picture to describe the events. Jennifer Valentine, a DNA analyst for Northwest Crime Lab, compared cuttings from the crotch area of the victim's panties to vaginal and buccal swabs from the victim and a reference swab from defendant. "Prostate specific antigen," a protein found in semen, found on the panties contained a DNA mixture from at least two people. Defendant's DNA matched as the major contributor, and the victim's DNA matched as the minor contributor.
Considering the above evidence, the trial court found defendant guilty as charged of aggravated rape and sentenced him to the mandatory sentence of life imprisonment at hard labor without benefit. Defendant has appealed his conviction.

*574 Discussion

Sufficiency of the Evidence
Defendant points out that the evidence introduced included only testimony, the videotape of the victim's statement, and DNA testing results. According to defendant, the victim's testimony was inconsistent with her videotaped statement. Defendant further notes that the victim's testimony did not corroborate her mother's statement regarding whether the mother referred to the child as a "little bitch" at the hospital. He questions the conflicting accounts of how the victim's panties were gathered for evidence and the DNA tests performed on them. Defendant notes that his robe was not tested and that Wiggins did not testify at trial. Defendant points out that the victim behaved normally the day after the incident, she disliked the defendant, and he had an "ongoing disciplinary problem" with the victim.
Aggravated rape is a rape committed where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed when the victim is under the age of 13 years. Lack of knowledge of the victim's age shall not be a defense. La. R.S. 14:42(A)(4).
The proper standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Bosley, 29,253 (La.App. 2d Cir.04/02/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333. The Jackson standard is applicable in cases involving both direct and circumstantial evidence. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App. 2d Cir.09/25/98), 719 So.2d 610, writ denied, 98-2723 (La.02/05/99), 737 So.2d 747.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a judge or jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La. App.2d Cir.08/30/02), 827 So.2d 508, writ denied, State ex rel. Gilliam v. State, 02-3090 (La.11/14/03), 858 So.2d 422. The testimony of a sexual assault victim alone is sufficient to convict a defendant. State v. Ponsell, 33,543 (La.App. 2d Cir.08/23/00), 766 So.2d 678, writ denied, 00-2726 (La.10/12/01), 799 So.2d 490; State v. Robinson, 36,147 (La.App. 2d Cir.12/11/02), 833 So.2d 1207. Such testimony alone is sufficient even where the state does not introduce medical, scientific or physical evidence to prove the commission of the offense by the defendant. State v. Ponsell, supra.
As with many such investigations, there were flaws in the collection and handling of the evidence in this case. The bedclothes and the robe worn by defendant the night of February 7, 2003, were never tested for DNA, and the tissue used by the victim to clean herself was not collected. Although there are contradictions regarding how and when the undergarments were collected, the panties worn by the victim were turned over to police by the victim's mother after the incident. As Det. Moreno stated, the victim's mother was first given her daughter's underwear at the hospital when they were removed by the victim. *575 At the request of Det. Moreno, the mother put the panties in a bag and brought them from home to the interview at the Gingerbread House.
Defendant argued that the panties belonged to the victim's mother, but the victim repeatedly stated that they were her underwear and the mother corroborated this statement, noting that at the time of the offense, she was smaller and wore a smaller size than her daughter. Both mother and daughter denied sharing underwear and reiterated the mother's statement that they wore different sized clothing. During testing, epithelial cells were separated from sperm cells and it was determined that prostate specific antigen, or protein found in semen, was present on the cuttings from the victim's underwear. Analysis showed DNA present from at least two individuals, with defendant's DNA profile showing that he was the major contributor and the victim was the minor contributor. Ms. Valentine testified that the probability of finding someone else with the same DNA profile as that of defendant was approximately one in 62.5 billion. Contrary to defendant's argument, the DNA evidence supports the victim's testimony that the rape occurred and that she put her panties back on after the assault.
There was a time delay between the assault and when the victim's mother learned of the rape. During her interview at the Gingerbread House the victim said that the assault occurred at 4:00 a.m., and she knew the time because there was a clock in her bedroom. She also told the interviewer that her mother was at the hospital when the rape occurred. She said it was "light" outside when she told her mother. The victim also told the interviewer that she went to a party before she told her mother. The mother testified that she was at the hospital with her grandmother when the rape occurred. The mother also stated that Valerie Brooks told her about the attack when the mother "walked in the door" and that she did not learn about it from her daughter. Both agreed, however, that the mother called 911 after hearing of the assault and checking her daughter's underwear for blood. The 911 call was placed at approximately 10:40 p.m., almost 19 hours after the sexual assault.
Defendant also points out other contradictions in the victim's statement and testimony. During the interview, the victim stated that defendant covered her mouth so that she could not scream, that defendant was naked on top of her when Glenn Wiggins walked into the room, and that she told Wiggins and Brooks what had happened the next morning. When asked at trial whether the tape of the interview was an accurate depiction, the victim agreed that it was. At trial, the victim again said that defendant covered her mouth with his hand. She then said that defendant's hand was not over her mouth when Wiggins entered the room and that defendant had "jumped out of bed and put his robe on and said he was getting some covers." The victim told defendant's attorney that her earlier statement about defendant being naked at that time had not been true. She testified that she asked Wiggins for help, but did not approach him or Ms. Brooks the next day to tell them what had happened. Also disputed by defendant was whether it would have taken "five minutes" for Wiggins to walk from his room to the victim's as testified by the victim. This confusion about time shows a poor conception of time rather than a lack of credibility.
Defendant's theory of the case was that the victim concocted the story of a rape to cover her sexual activity with boys in the neighborhood. According to defendant, *576 the victim had been sexually active with young men for a period of weeks or months. This theory, however, is belied by the medical report which noted that the victim's hymen was intact.
While the testimony about whether the victim's mother called her a "little bitch" at the hospital could go to the issue of credibility, it is essentially a collateral matter and has more to do with the mother's parenting skills than whether her daughter was in fact sexually assaulted. Furthermore, the mother did not outright deny making the statement; she simply stated that she did not recall using that term in referring to her daughter.
The trial court announced its verdict, articulating that it was based largely on the statement and testimony of the victim, taken together with the DNA evidence. While there were evidentiary problems, contradictions in statements and unavailable witnesses, the evidence presented to the trial court was more than sufficient to support defendant's conviction of aggravated rape.

Denial of Requests for Funds for Expert and Time for Additional Testing
Defendant's next assignment of error is that the trial court erred in denying his pro se motion for state funding of ancillary services which he filed on July 7, 2005. In support, defendant cites State v. Touchet, 93-2839 (La.09/06/94), 642 So.2d 1213, and State v. Phillips, 05-1338 (La. App. 1st Cir.03/29/06), 934 So.2d 162.
State v. Touchet, supra, requires a defendant to show "with a reasonable degree of specificity what type of expert is needed and for what purpose," and "that it is more likely than not that the requested expert assistance will be required to answer a serious issue or question raised by either the prosecution's or the defense's case." Id. at 1221. The defendant must therefore establish that "there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial." Id. at 1216.
On January 6, 2005, the state filed a supplemental discovery response in which it provided defendant with copies of results from the DNA tests conducted by the North Louisiana Crime Lab. The minutes show that on April 7, 2005, defendant and his attorney appeared in court and deemed their discovery motion satisfied. On July 7, 2005, more than six months after the state provided him with copies of the DNA results from the tests it had run and less than one month before trial was set to begin, defendant filed a pro se "Motion for State Funding of Ancillary Services."
Unlike the particularized motion filed by the defendant in the State v. Phillips, supra, in which the accused sought funding for two types of expert witnesses, including a DNA expert to address the state's DNA evidence as well as experts in psychiatry and psychology to investigate a possible insanity defense, the motion defendant filed in the instant case was standardized. Defendant asked the court for funding for ancillary services, "investigative expenses, costs for preparation of the record and transcripts, and expert witnesses necessary for counsel to prepare a constitutionally adequate defense."
Another key difference between the instant case and State v. Phillips, supra, is the timing of the motions. In State v. Phillips, defendant's request for funding for a DNA expert was filed less than one week after the state gave notice of its intent to use the DNA evidence. The court found the defendant's particularized request for a hearing on his motion for funds to meet the "good cause" requirement of La. C. Cr. P. art. 521.
On the other hand, in the case sub judice, defendant's motion was filed more than six months after he was provided with *577 copies of the state's DNA test results and less than one month before trial. Two days before trial was set to begin, defendant's court appointed attorney made an oral motion for a continuance to address defendant's pro se motion. At that time, defendant's attorney asserted for the first time that defendant was seeking funding for an independent test of the items sent to the crime lab. Defense counsel also alluded to defendant's request that he "recontact" witnesses he had already interviewed. Both the motion for continuance and motion for state funding were denied on August 1, 2005.
On September 13, 2005, after his conviction, defendant filed a pro se motion asking for the first time that DNA testing be performed comparing the DNA of the victim's mother to the DNA found on the victim's panties. He also alleged that the failure to test the victim's mother's DNA constituted grounds for a new trial in his pro se new trial motion filed the same date.
We cannot say that the trial court erred in denying defendant's untimely, generalized motion for funding for ancillary services. See State v. Craig, 95-2499 (La.05/20/97), 699 So.2d 865, cert. denied, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997); State v. Wafer, 31,078 (La.App. 2d Cir.09/23/98), 719 So.2d 156, writ denied, 99-1114 (La.10/01/99), 747 So.2d 1137.
Denials of Post-Trial Motions
The court, on motion of the defendant, shall grant a new trial whenever the verdict is contrary to the law and the evidence or when the court's ruling on a written motion or an objection made during the proceedings shows prejudicial error. La. C. Cr. P. art. 851(1) and (2).
Defendant filed a pro se motion for new trial, asserting entitlement to a new trial because testing was not performed to determine whether the victim's mother's DNA was present on the panties tested by the crime lab; the trial court erred in denying his request for funds for DNA testing; the lack of physical evidence other than the DNA obtained from the panties; and because "correct procedure was not followed in handeling (sic) of the evidence." His defense counsel's motions for new trial and post-verdict judgment of acquittal simply claimed that the verdict rendered was contrary to the law and evidence. A second motion for post-verdict judgment of acquittal urged that the victim was the only witness to accuse defendant of rape and pointed out inconsistencies in her statements and testimony and claimed that she "fabricated this story to conceal the fact that she had been sexually active with some boys in the neighborhood." Defense counsel also claimed that "there was absolutely no physical evidence linking defendant to this alleged crime" and that "it was clearly shown that the panties belonged to the alleged victim's mother."
These arguments were all addressed above. The evidence was sufficient to support defendant's conviction of aggravated rape. Defendant's generalized motion for state funds filed less than one month before trial was properly denied. We again note that it was only two days before trial and then again post-trial that defendant for the first time specified that he was seeking funding for independent DNA analysis. Too little, too late, found the trial court. We likewise find no error in the trial court's denial of the post-trial motions.

Conclusion
For the reasons set forth above, defendant's conviction and sentence are affirmed.
AFFIRMED.