Judgment rendered January 13, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,597-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                              Appellee

versus

CHARLES RAY DYAS, JR.                           Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 322,453

Honorable Katherine Dorroh, Judge

* * * * *

THE HATCH LAW FIRM, LLC                         Counsel for Appellant
By: Christopher Hatch


JAMES E. STEWART, SR.                           Counsel for Appellee
District Attorney

JASON WALTMAN
NANCY BERGER-SCHNEIDER
MALLORY RICHARD
Assistant District Attorneys

* * * * *


Before PITMAN, THOMPSON, and BLEICH (*Pro Tempore*), JJ.

**THOMPSON, J.**

This criminal appeal arises from the First Judicial District Court, Caddo Parish, the Honorable Katherine Dorroh presiding. Following a trial, Charles Ray Dyas, Jr. was convicted by unanimous jury verdict of one count of sexual battery, victim under age 13, in violation of La. R.S. 14:43.1. Dyas received a sentence of 45 years at hard labor, with the first 25 years without benefit of parole, probation or suspension of sentence. Timely motions for post-verdict judgment of acquittal and new trial were denied. This appeal follows.

Dyas appeals his conviction, arguing that the evidence was insufficient to convict him, that the trial court abused its discretion by denying funding for an expert, that the trial court abused its discretion by ruling that proposed expert testimony was irrelevant, and that his constitutional rights were violated due to *Brady* violations. For the following reasons, Dyas' conviction and sentence are affirmed.

## FACTS

On March 18, 2014, the Shreveport Police Department sex crimes unit received a complaint that Charles Ray Dyas, Jr. had been sexually assaulting his two stepchildren, N.D. and D.D. Both alleged victims were juveniles under the age of 13 at the time of the alleged offenses. On March 20, 2014, interviews were arranged at the Gingerbread House children's advocacy center with the children and their mother, L.J. L.J., the defendant's wife, informed SPD Detective De'Andre Belle ("Det. Belle") that she and her family discovered the abuse by reading text message conversations between

N.D. and her best friend, wherein N.D. confided to her friend that her stepfather had been sexually assaulting her for the past three years.

By the first bill of information, filed on May 20, 2014, Dyas was charged with two counts of aggravated incest under La. R.S. 14:78.1(A), (B)(2) & (D)(2). However, by amended bill of information, Dyas' charges were subsequently changed to two counts of sexual battery of a victim under the age of 13 under La. R.S. 14:43.1(A)(1) & (C)(2).[1] At issue in the assignments of error raised by Dyas is the absence of proof of vaginal penetration of the alleged victims. Neither charge requires such penetration for conviction.

On April 22, 2019, jury trial commenced. The evidence included the testimony of numerous witnesses, including family members, law enforcement personnel, expert medical personnel, and the defendant, as follows:

The maternal grandmother of N.D. and D.D testified at trial. The grandmother testified that she did not approve of her daughter's and Dyas' relationship from the start because they were cousins. She testified that N.D. and the other children lived with her during the week and stayed at their mother's residence on the weekends. She testified that N.D. seemed reluctant to return to her mother's house on the weekends and that she noticed N.D. staying in her room more and more, spending significant time on her Kindle Fire tablet, which was unusual for her. The grandmother told L.J. about this behavior, and L.J. discovered the text message conversation

---

[1] Dyas was found not guilty of the charge relating to his younger stepdaughter, D.D.

between N.D. and her best friend, L.B., regarding ongoing sexual abuse by Dyas. She testified that Dyas was never welcome in her home, even prior to the sexual abuse allegations.

L.J. testified that she is the mother of N.D. and D.D. and that she first dated Dyas when she was 15 and he was 17 or 18, against her mother's wishes. Dyas then moved to Virginia in 1999. They rekindled their relationship around 2006 upon his return to Shreveport. By that time, L.J. had given birth to N.D., D.D., and one other child from a previous relationship. L.J. and Dyas were married in 2010. L.J. testified that she worked the night shift at restaurants and that her children went back and forth between her mother's home and her home, staying with Dyas.

L.J. testified that on March 14, 2014, she went to her mother's house to pick up N.D. The grandmother told her that N.D. had been spending a lot of time on her Kindle. L.J. asked N.D. to give her the Kindle, and she accessed it through a passcode. Upon accessing the Kindle, text messages between N.D. and her best friend, L.B., appeared on the screen. L.J. read the text messages, and the nature of the conversation was that N.D. was being abused. L.J. questioned N.D., who was embarrassed and reluctant to talk. About ten minutes after discovering the text messages and speaking with N.D., L.J. called the police and requested that they respond to her and Dyas' residence. L.J. testified that she accompanied her children to the Gingerbread House, and spoke with Det. Belle there. Afterwards, she took N.D. and D.D. to be examined by a doctor at the CARA Center.

On cross-examination, L.J. testified that she is still legally married to Dyas, because obtaining a divorce is expensive. She also admitted to writing him love letters in jail. L.J. confirmed her prior testimony from the

preliminary examination hearing that she did not see any signs that her children were being abused by Dyas. She confirmed she was the person to involve the police based upon her concerns.

N.D. testified that she is now 17 years old and a senior in high school, but that she was about 8 years old when her mother first began dating Dyas. Dyas moved into their apartment on North Market Street in Shreveport when she was around 9 years old. N.D. went back and forth between her mother's residence and her grandparents' residence. When Dyas first moved in with her family, she thought he was nice and saw him as a father figure.

N.D. further testified that the first time Dyas touched her was at the apartment on North Market Street while playing video games together. She stated that Dyas touched her "in my area." Only she and Dyas were in the home. N.D. stated "he touched my vagina outside my clothes." She stated that Dyas used his hands and tried to rub on her. Dyas did not touch N.D. again at the apartment on North Market Street. She testified that the second time Dyas touched her, she was 10 years old, and they had moved to a new residence on Youree Drive. That time, N.D. was again alone with Dyas at home. He came into the room where she slept and touched her over her clothes in her vaginal area. N.D. testified that she did not say anything to her mother about either of these instances because she was afraid and "didn't want to be a problem."

When N.D. turned 11, the family had moved to yet another address, on Timothy Circle. N.D. stated that she was going into the 6th grade and had started her menstrual cycle that summer. She testified it was at that time that everything escalated. Prior to the move to Timothy Circle, she spent much of her time at her grandparents' home. N.D. testified that when she turned

12, she spent more time at her mother's residence on Timothy Circle. N.D. testified that Dyas would come into her bed and "put his hand under the cover and touch on me while I was laying down." N.D. testified that Dyas used his hands, and would touch her vaginal area, and his fingers would go inside her vagina. N.D. testified that she "can't even count" the number of times this occurred at the Timothy Circle location. She said it happened "pretty much every time I went over there." N.D. testified that he would try to take her hand or foot and rub it against him, on his penis. When asked why she did not tell anyone about what was happening with Dyas, N.D. testified that she was scared of what would happen if she told, and she did not want anyone to get hurt. N.D. testified that about a month prior to her family's becoming aware of the abuse, Dyas attempted to penetrate her with his penis. N.D. was in the bedroom when Dyas came into the room with her and pulled her shorts down, and Dyas pulled his penis out of his shorts.

From March 12 to 14, 2014, N.D. testified that she had her Kindle at her grandparents' residence, she connected to the Wi-Fi and used a text messaging app to send text messages to her best friend, L.B. N.D. testified that her mother found the text messages between her and L.B. on the Kindle. N.D.'s mother asked her if the text messages about Dyas were true, and she told her mother yes.

Over two days, on cross-examination, defense counsel took N.D. through almost the entire text message conversation with L.B. (which included a significant amount of slang terms/spellings and some profanity). N.D. was questioned about the text messages she sent to L.B. saying that she had a secret to tell, and urging L.B. to never tell anyone her secret. N.D. read aloud many of the messages she had sent, telling her friend about the

times that Dyas had inappropriately touched her. All of the text messages that N.D. read aloud revealed an emotional conversation between the two friends about the sexual assault allegations.

N.D. testified that every night she stayed at Timothy Circle, Dyas touched her with his hands. N.D. described the first and only time that Dyas attempted to penetrate her with his penis: "he tried to put his penis in me and it wouldn't go, and I was really – I really started moving a lot and fidgeting and stuff, and so he stopped." N.D. testified that when Dyas put his fingers inside of her, it was painful every time. N.D. testified that Dyas also attempted to perform oral sex on her.

L.B. testified at trial, confirming the authenticity of the text message conversation between her and N.D. from March 12-14, 2014. L.B. testified that she went to the Gingerbread House and had an interview about the conversation she had with N.D. She also produced her phone containing the text messages to police at the Gingerbread House in March 2014.

D.D., N.D.'s younger sister and Dyas' other stepdaughter, testified that her relationship with Dyas began to change around the time she turned 10 and she entered puberty. D.D. stated that he began "touching and fondling" her on her chest, vagina, and lips. Dyas would come into the bedroom where she was sleeping at night and sit next to her bed and touch her. D.D. stated that he would move her underwear to the side and touch her with his fingers. She estimated Dyas touched her more than six times. All of the incidents occurred at the residence on Timothy Circle. D.D. testified that she was under 13 years of age when the touching occurred. D.D. did not report the touching to anyone. She stated that her "confidence kind of depleted, so – and I didn't feel like myself. I didn't feel like myself. I didn't

6

like myself, so I kind of hid that part of me." She did not want to report the abuse and disappoint her mother, who seemed happy. D.D. stated that she had a feeling that Dyas was also touching her sister, N.D., because she noticed N.D.'s behavior changed when she was around him.

On cross-examination, D.D. stated that prior to the discovery of N.D.'s text messages, she did not have any knowledge of Dyas touching her sister. D.D. did not remember ever witnessing Dyas touch N.D. After the police were called following the discovery of N.D.'s text messages, D.D. admitted to her mother and her grandmother that Dyas had also touched her.

Following their interviews at the Gingerbread House, Dr. Shelia Farrell, a board-certified child abuse pediatrician, conducted the physical examinations of N.D. and D.D. at the Christus CARA Center (a medical treatment center for abused children). Dr. Farrell testified that when examining children who have been sexually abused, there are often no "physical findings" of penetration. When she examined N.D., the physical examination results were normal. Despite having a normal exam, Dr. Farrell stated that "the majority of children that disclose sexual abuse are going to have normal exams." In her report regarding N.D.'s physical examination, Dr. Farrell noted "genital-to-genital contact." This statement by N.D. to Dr. Farrell was consistent with the report of the attempted penetration of N.D. by Dyas with his penis. Dr. Farrell testified that she uses a stick figure to help children indicate where contact occurred when obtaining a report. Dr. Farrell testified that D.D. also had a normal physical examination.

On cross-examination, Dr. Farrell stated that she did not remember the exact words that N.D. used to describe the abuse. She explained that her conversations with the children are not detailed, and it is difficult for the

children to talk about abuse.  Her role is to obtain the information she needs in order to conduct an examination of the child's body and determine whether the child is safe and healthy.  Dr. Farrell testified that she did not see any damage to any part of N.D.'s anatomy, including her hymen.

Det. Belle also testified, describing his job duties with the Shreveport Police Department as including the investigation of sexual assaults with adult and juvenile victims.  Det. Belle testified that when a victim is a child, the police do not conduct the interview.  The children are taken to the Gingerbread House to be interviewed.  At the Gingerbread House, he sits in an adjacent room and is able to see and hear the interview over closed circuit television.  Det. Belle testified that he arranged for the interviews of N.D. and D.D. at the Gingerbread House.  He did not conduct the interviews of N.D. or D.D.  Det. Belle testified that he completed the "history" portion on the CARA center physical examination form for N.D, which provided: "N.D. stated that her stepfather, Charles Dyas, has been touching her and her sister D.D.'s vagina for the past three years.  N.D. also advised he has had vaginal sex with her five times in the past three years."

Det. Belle admitted at trial that he did not complete the history portion of the form until after he spoke with Dr. Farrell following N.D.'s exam. Prior to the trial, Det. Belle provided a supplement to his original report that provided that N.D. said "attempted" intercourse.[2]

---

[2] Outside the presence of the jury, a discussion was had relating to Belle's supplemental report.  Prior to the trial, the district attorney asked Belle if he was certain about his report of vaginal intercourse with N.D., because it was the only place in the record that it appeared, and it did not match the district attorney's pretrial interviews of the children or the Gingerbread House interviews.  This pretrial discussion between the district attorney and Belle resulted in the submission of the January 7, 2019, supplement regarding "attempted" intercourse.  The trial judge determined that the issue of the supplemental report could be appropriately resolved during Belle's cross-examination.

On cross-examination, Det. Belle was asked about prior testimony during a preliminary examination hearing on June 3, 2014. Det. Belle stated that he remembered testifying that Dyas had vaginal sex with N.D. five times. He confirmed that he completed his original report only after speaking with Dr. Farrell following N.D.'s physical exam. Det. Belle testified that the district attorney called him and asked him about the statements contained in his report from 2014. He reviewed his report and Dr. Farrell's report, and determined that N.D. could have said "attempted" vaginal intercourse. Therefore, he prepared the supplemental report to correct the error.

Alex Person is a forensic interviewer at the Gingerbread House. Person confirmed that she conducted both N.D. and D.D.'s forensic interviews, which were recorded, and the videos were played for the jury. The state rested the presentation of their case at this point.

Charles Dyas testified in his own defense. Dyas testified that his wife, L.J., sent him several love letters in jail and continued their romantic relationship through 2016. Dyas testified that N.D. and D.D.'s biological father had threatened to kill him in the past. Dyas denied having any sexual contact with his stepdaughters, and denied being sexually attracted to children.

On cross-examination, Dyas confirmed that he was convicted of sexual battery and animate object sexual penetration in the state of Virginia, received a 15-year sentence, and that the victim in those cases was a juvenile.

A unanimous jury convicted Dyas on Count One, sexual battery, victim under age 13 relative to N.D. Dyas was found not guilty on Count

Two, related to the charges associated with D.D. On May 20, 2019, the trial court issued a written ruling denying the defendant's motion for a new trial. On June 12, 2019, the trial court denied a motion for post-verdict judgment of acquittal, and sentenced Dyas to forty-five 45 years at hard labor, with the first twenty-five 25 years to be served without the benefit of parole, probation or suspension of sentence. A timely motion to reconsider sentence was filed and denied. This appeal followed, in which Dyas raises the following four assignments of error:

1. **The evidence adduced at trial is insufficient to support defendant's conviction for sexual battery.**

2. **The trial court abused its discretion when it denied defendant's motion for expert funding.**

3. **The trial court abused its discretion, and violated defendant's constitutional right to present a defense, when it ruled that defendant's proposed expert testimony was "irrelevant" and inadmissible but permitted the state to present an expert medical witness on precisely the same issue.**

4. **Defendant's conviction must be vacated under the due process clause of the 14th Amendment to the United States Constitution due to the failure of the state to correct testimony that it knew to be false and because the state failed to make, or failed to make timely, several *Brady* disclosures to defendant.**

## DISCUSSION

**Assignment of Error Number One:** **The evidence adduced at trial is insufficient to support defendant's conviction for sexual battery.**

Dyas argues that N.D.'s trial testimony was contradictory and inconsistent with her Gingerbread House interview and prior statements to police. For instance, Dyas argues that N.D. stated during her Gingerbread House interview that Dyas never touched her with anything other than his hands. However, at trial, N.D. testified that on one occasion he tried to

10

penetrate her with his penis. Further, he points out that in her text message conversation with L.B., N.D. stated that "he hasn't tried to have sex with me," but N.D. also told L.B. in the text messages that Dyas "raped" her. Dyas asserts that N.D.'s trial testimony was internally contradictory and irreconcilably inconsistent with her Gingerbread House interview and statements to police, L.B., and Dr. Farrell. Dyas argues that the jury exceeded the bounds of rationality when it relied on N.D.'s uncorroborated testimony to convict him of sexual battery.

The state asserts that Dyas was a convicted sex offender with a juvenile victim, and that the evidence indicated a lustful disposition of Dyas toward N.D. The state further asserted Dyas had opportunity, as he was often alone at his home with N.D. while her mother worked. N.D. described in detail how Dyas used his hand to rub her private area by touching her both outside of her clothes, and inside her clothes to rub her vaginal area and penetrate her vagina with his fingers. Additionally, the examining physician, Dr. Farrell, testified that she used the term "genital to genital contact" on her report, and not vaginal intercourse, which are distinguishable terminologies. She also testified that most children who are victims of sexual abuse receive normal physical examination results. The state argues that Dyas' arguments using only certain sections of the entire text message conversation between N.D. and L.B. do not rise to the level of proof of internal contradiction or irreconcilable conflict. The jury was informed of the reasons that inconsistencies might occur between initial interviews and later explanations in the case of a juvenile victim. Defense counsel conducted exhaustive cross-examination of witnesses on all of the issues

11

Dyas raises on appeal, which provided the jury with the ability to weigh the evidence and assess the credibility of N.D.

**Applicable Law**:

The standard of *Jackson v. Virginia,* 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), governs review of claims of insufficient evidence. Under that standard, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Ellis*, 14-1511 (La. 10/14/15), 179 So. 3d 586, *cert. denied*, 136 S. Ct. 1462, 194 L. Ed. 2d 553 (2016). The *Jackson* standard does not permit this Court to substitute its own appreciation of the facts for that of the factfinder. *State v. Crawford*, 14-2153 (La. 11/16/16), 218 So. 3d 13. It is not the province of the reviewing court to assess the credibility of witnesses or reweigh evidence. *Id.* Great deference is given to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Jones*, 45,450 (La. App. 2 Cir. 8/11/10), 46 So. 3d 711, *writ denied*, 10-2082 (La. 2/11/11), 56 So. 3d 1000; *State v. Eason,* 43,788 (La. App. 2 Cir. 2/25/09), 3 So. 3d 685, *writ denied*, 09-0725 (La. 12/11/09), 23 So. 3d 913, *cert. denied*, 561 U.S. 1013, 130 S. Ct. 3472, 177 L. Ed. 2d 1068 (2010).

Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Sanderson*, 49,957 (La. App. 2 Cir. 7/22/15), 174 So. 3d 149; *State v. Echols*, 39,754 (La. App. 2 Cir. 6/29/05), 907 So. 2d 263; *State v. Allen,* 36,180 (La. App. 2 Cir. 9/18/02), 828 So. 2d 622, *writs denied,* 02-2595 (La.

3/28/03), 840 So. 2d 566, 02-2997 (La. 6/27/03), 847 So. 2d 1255, *cert. denied,* 540 U.S. 1185, 124 S. Ct. 1404, 158 L. Ed. 2d 90 (2004).

The testimony of the victim of sexual assault is alone sufficient to convict the defendant. *State v. Rives,* 407 So. 2d 1195 (La. 1981); *State v. Berry*, 51,213 (La. App. 2 Cir. 5/17/17), 221 So. 3d 967; *State v. Sanderson*, *supra.* Such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. *State v. Berry, supra; State v. Sanderson, supra.*

At the time of this offense, the relevant portions of sexual battery were defined in La. R.S. 14:43.1 in pertinent part as follows:

> A. Sexual battery is the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim, when any of the following occur:
>
> (1) The offender acts without the consent of the victim.
>
> . . . .
>
> C. (2) Whoever commits the crime of sexual battery on a victim under the age of thirteen years when the offender is seventeen years of age or older shall be punished by imprisonment at hard labor for not less than twenty-five years nor more than ninety-nine years. At least twenty-five years of the sentence shall be served without benefit of parole, probation, or suspensive of sentence.

**<u>Application of Law to Facts</u>**:

Review of the evidence in the light most favorable to the state supports the sexual battery conviction. If believed, N.D.'s testimony alone supports the verdict of the jury. The jury was free to weigh the evidence and make a credibility determination about N.D.'s claims after considering any

13

inconsistencies in her testimony regarding if, how and when any illegal touching occurred. Great deference is given to a jury's decision to accept or reject the testimony of a witness in whole or in part, and this Court will not re-evaluate the credibility of witnesses or re-weigh the evidence.

Despite any inconsistencies in N.D.'s text messages, Gingerbread House interview, and trial testimony regarding the exact nature of the touching, N.D. consistently reported and testified at trial that Dyas touched and digitally penetrated her vagina with his fingers. Any minor inconsistencies are not sufficient to warrant the rejection of N.D.'s testimony as competent evidence of Dyas' guilt. *See State v. Joyner*, 50,740 (La. App. 2 Cir. 6/22/16), 197 So. 3d 724, *writ denied*, 16-1493 (La. 6/16/17), 219 So. 3d 1111. Evidence that Dyas touched and digitally penetrated N.D.'s vagina is sufficient proof that Dyas was guilty of the crime of sexual battery. *State v. Ordonez*, 16-619 (La. App. 5 Cir. 3/15/17), 215 So. 3d 473; *State v. Gonzalez*, 15-26 (La. App. 5 Cir. 8/25/15), 173 So. 3d 1227; *State v. Perkins*, 11-162 (La. App. 5 Cir. 12/28/11), 83 So. 3d 250. Thus, this assignment of error has no merit.

**Assignment of Error Number Two: The trial court abused its discretion when it denied defendant's motion for expert funding.**

Dyas argues that his request for expert funding was wrongfully denied by the trial judge. Dyas filed an *ex parte* motion for expert funding so that he could introduce expert testimony to challenge the state's medical expert testimony that the lack of damage to N.D.'s genitalia and/or hymen was not probative of whether she had been sexually abused. Dyas sought to introduce expert testimony to show that if he had engaged in vaginal

14

intercourse with his stepdaughter, it is likely there would have been observable anatomical damage.

On April 5, 2019, during pretrial hearings, the trial judge issued a lengthy oral ruling, detailing her reasons for denial of Dyas' *ex parte* motion for expert funding. The judge noted:

> [T]he state has never charged or claimed that Mr. Dyas has had sexual intercourse with any of these children. That was contained in an affidavit submitted by Detective Belle that obviously was not supported by the evidence that the State reviewed because he was charged later with sexual battery as the case developed.

The judge also analyzed pertinent language in *State v. Touchet*, 93-2839 (La. 9/6/94), 642 So. 2d 1213, which Dyas cited in support of his motion for expert funding. Specifically, the trial judge stated that Dyas omitted the fact that he first needed to prove that the expert would assist in his defense. The judge stated:

> Defendant is correct in that *Touchet* states the procedure to follow when an indigent defendant wants to hire an expert witness, but the defendant conveniently leaves out the fact that he first needs to prove that the expert would assist in his defense. Given that the elements of the crime alleged here which is sexual battery, the Court is not convinced that an expert would assist […] in Mr. Dyas' defense or that an expert opinion is even relevant to the elements of the crime of the facts of the case. . . . The Court concludes that the defendant has not demonstrated that there exists a substantial question that requires expert testimony for its explication.
>
> What we have in this case are factual issues. Perhaps inconsistencies [are] what they should be called in what was reported, when and to whom. The issues before the Court are credibility calls that the trier of fact must resolve. Expert testimony for this is not required to resolve any of those issues. Cross-examination of the State's witnesses

15

> is all that is necessary to present the credibility call
> to the jury.

The trial judge analyzed the standard set forth in *State v. Touchet, supra,* and found that a defendant must establish with a reasonable degree of specificity that the assistance is required to answer a substantial issue or question that is raised by the prosecution's case or to support a critical element of the defense. The trial judge concluded that Dyas had not demonstrated "that there exists a substantial question that requires expert testimony for its explication." The trial judge found that factual issues and inconsistencies existed regarding exactly what type of sexual abuse was reported, and to whom. Those factual issues did not require expert medical opinion, but rather amounted to determining and assigning credibility of the witnesses, which were to be determined by the trier of fact. The trial judge noted that Dyas could cross-examine Dr. Farrell, the examining physician, regarding her opinions, her examination, and the studies upon which she relied to form her opinions, as well as Detective Belle and N.D. herself.

On appeal, Dyas argues that this evidence would support his "theory of the defense" that the allegations made by N.D. were fabrications which were also inconsistent with the lack of any damage to her genital anatomy. Dyas argues that this evidence was not offered to prove or disprove an element of the charged offense, but to demonstrate that N.D.'s allegations of sexual intercourse were false.

The state argues that the trial court did not abuse its discretion in denying expert funding. The state notes that it never claimed Dyas had sexual intercourse with N.D., nor did the Gingerbread House interview with N.D. mention vaginal intercourse. In addition, Dr. Farrell's report refers to

16

genital to genital contact, but did not mention vaginal intercourse. The credibility issues related to Det. Belle's report were properly addressed at trial through the testimony of various witnesses. The state asserts that Dyas had not established with a reasonable degree of specificity that the assistance of an expert was required to answer a substantial issue or question raised in the prosecution's case, or to support a critical element of the defense.

**Applicable Law**:

Due process protections afforded under the Fourteenth Amendment provide that justice requires that an indigent defendant must not be denied a meaningful and fair opportunity to present his defense. *State v. Touchet, supra.* In order to provide an indigent with that opportunity, courts have required the state to provide to the indigent defendant cost-free assistance of court-appointed trial counsel. *State v. Touchet, supra* at 1214-15. Counsel must also be effective, and effective assistance requires that an indigent defendant's counsel be provided with the basic tools of an adequate defense at no cost to the indigent defendant. *Id*.

The *Touchet* court also observed that various types of expert assistance have been found crucial to an indigent person's defense and held that the indigent defendant should establish that the expert assistance will be necessary to the construction of an effective defense. *Id*. at 1215. *State v. Touchet, supra,* requires that a defendant requesting a state-funded expert must establish that "there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial." *Id*. at 1216. "To meet this standard, a defendant must ordinarily establish, with a reasonable degree of specificity, that the assistance is required to answer a substantial issue or

17

question that is raised by the prosecution's case or to support a critical element of the defense." *Id.*

A standardized and generalized motion for funding for ancillary services will not suffice for the particularized motion required to obtain funding for an expert witness. *See State v. Burnham*, 41,146 (La. App. 2 Cir. 10/11/06), 942 So. 2d 571, *writ denied*, 06-2736 (La. 6/15/07), 958 So. 2d 1186.

**<u>Application of Law to Facts</u>**:

The trial judge did not err in finding that Dyas failed to show with a reasonable degree of specificity that expert testimony relating to N.D.'s lack of anatomical damage from sexual intercourse was necessary to put forward a defense against N.D.'s claims. Dr. Farrell testified that physical indicators of sexual abuse are not always present in abuse victims. In her experience, most examinations of sexually abused children result in normal examination findings. Additionally, many sexual abuse cases do not involve vaginal penetration. Specifically, Dr. Farrell noted "genital-to-genital contact" in N.D.'s report, but did not specify penetration or intercourse. Therefore, an expert's testimony on behalf of Dyas regarding a lack of physical findings in N.D.'s examination would not have impacted his defense. Dyas based his need for this type of expert testimony on the need to discredit N.D.'s allegations of vaginal intercourse and penetration. However, the record does not show that N.D. ever alleged that vaginal intercourse did in fact occur, and the state was not required to prove vaginal intercourse to prevail on the charge of sexual battery or even the original charge of aggravated incest. Therefore, any lack of physical findings that would result from vaginal intercourse would not have benefited the defense of the sexual battery

claims. Penetration is not an element of the crime with which Dyas was ultimately convicted. This assignment is without merit.

**Assignment of Error Number Three: The trial court abused its discretion, and violated defendant's constitutional right to present a defense, when it ruled that defendant's proposed expert testimony was "irrelevant" and inadmissible but permitted the state to present an expert medical witness on precisely the same issue.**

At the trial, the trial judge granted the state's oral motion *in limine* regarding Dyas' proposed medical expert[3] related to vaginal penetration of N.D. The trial judge stated: "there is no allegation that there has been forcible vaginal intercourse." Because there was no allegation of vaginal intercourse, and because that was not an element of the crime for which Dyas was charged, the trial judge ruled that expert testimony as to that issue was not relevant.

Dyas argues that the trial court abused its discretion in denying the admission of expert testimony on the issue of N.D.'s allegations of sexual intercourse.[4] Focusing on Det. Belle's original report and preliminary examination testimony, Dyas repeatedly urges the relevance of N.D.'s allegations of sexual intercourse, and that if sexual intercourse had occurred, there would be physical findings upon examination. Dyas argues that the state was allowed to adduce expert opinion testimony that the lack of damage to N.D.'s genital anatomy did not undermine her claims of being

---

[3] Dyas claimed he was able to obtain an expert willing to testify *pro bono* regarding the issue of lack of physical damage resulting from vaginal intercourse.

[4] This writer notes that the charges of sexual battery did not require any determination as to whether sexual intercourse occurred. Dyas repeatedly claims that N.D. made claims that he engaged in vaginal intercourse with her; however, the record does not indicate that N.D. herself ever alleged vaginal/sexual intercourse occurred.

abused, but the defendant was not allowed to contradict that testimony with his own expert.

The State argues that Dyas' expert testimony that physical damage would occur with repeated sexual intercourse to a juvenile is not relevant, when in fact, the juvenile testified there was no repeated sexual intercourse. The testimony of the defense expert would not be relevant to the crime of sexual battery as such testimony would not be of consequence to the determination of the action. N.D.'s lack of anatomical damage is not relevant when there is no evidence or claim by N.D. that sexual intercourse ever occurred.

**Applicable Law**:

To be admissible, the evidence must be relevant to an issue material in the case. A material issue is one which is of consequence or importance to the case. Relevant evidence is that tending to show the commission of the offense and the intent, or tending to negate the commission of the offense and the intent. La. C.E. arts. 401, 402. A trial judge's determination of the relevancy of testimony is afforded great weight and will not be disturbed absent an abuse of discretion. *State v. Henderson*, 46,057 (La. App. 2 Cir. 3/2/11), 58 So. 3d 552, *writ denied*, 11-0674 (La. 10/14/11), 74 So. 3d 216; *State v. Wiley*, 614 So. 2d 862 (La. App. 2 Cir. 1993).

**Application of Law to Facts**:

Dyas focused his arguments on the initial report and a warrant prepared by Det. Belle, to support his argued need for expert medical testimony regarding physical damage that would result from vaginal intercourse. Despite the confusion that existed throughout these proceedings relating to Det. Belle's "clerical errors" it is clear from the record that any

20

imprecise police work cannot countervail the testimony of N.D. and the evidence the state introduced at trial, which did not seek to prove that vaginal intercourse occurred. Further, vaginal penetration was not an element of the offense charged, sexual battery. The state's expert, Dr. Farrell, testified regarding her opinion that a lack of physical trauma did not preclude the possibility that a child has been abused. In addition to her own experience examining sexually abused children, she cited numerous studies that also supported her expert opinion. Also, the trial court did not preclude Dyas from offering any expert testimony that was potentially relevant to the charged offense. The trial court did not abuse its discretion in ruling that Dyas' proposed medical expert testimony was irrelevant. Therefore, this assignment of error is without merit.

**Assignment of Error Number Four: Defendant's conviction must be vacated under the due process clause of the 14th Amendment to the United States Constitution due to the failure of the state to correct testimony that it knew to be false and because the state failed to make, or failed to make timely, several *Brady* disclosures to defendant.**

Dyas argues that the state failed to inform the jury that Det. Belle did not actually discover his "clerical error" himself, that ultimately resulted in the filing of his supplemental report changing N.D.'s allegation from "vaginal intercourse" to "attempted" vaginal intercourse. Dyas asserts that Det. Belle received a call from the assistant district attorney regarding this discrepancy. Further, Dyas alleges that the state was aware that Det. Belle never spoke to N.D. and failed to disclose that information. Dyas claims to have been "blindsided" by the innumerable substantive changes to the state's case at trial, including previously mentioned claims related to "vaginal

intercourse" reports, as well as issues regarding the collection of the evidence of the text message conversation from L.B.'s phone.

The state argues that it did supply notice to Dyas in a timely manner, with the filing of supplemental discovery on January 7, 2019, which contained Det. Belle's supplemental report. Therefore, Dyas was not denied due process, as the material was provided in sufficient time for effective use at trial. The state asserts that there is no *Brady* violation where the evidence is available from another source, because in such cases, there is really nothing for the government to disclose. The state also asserts that Dyas fails to show that the evidence rises to a level capable of lessening confidence in the verdict in this case. The state disclosed the information of a discrepancy in a timely manner, and the disclosure of the discrepancy did not contribute any facts that discredited the testimony of N.D.

**Applicable Law**:

Suppression by the prosecution of evidence favorable to an accused upon his request for such evidence violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State v. Allen*, 52,708 (La. App. 2 Cir. 6/26/19), 277 So. 3d 460. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

The late disclosure of such evidence may also require a reversal if the timing significantly impacted the defendant's opportunity to effectively

22

utilize the material.  However, a defendant shows no entitlement to relief if the information was available to him through other means by the exercise of reasonable diligence.  *State v. Green*, 16-0107 (La. 6/29/17), 225 So. 3d 1033, *cert. denied*, 138 S. Ct. 459, 199 L. Ed. 2d 338 (2017).

**<u>Application of Law to Facts</u>**:

There is no indication in the record that the state withheld any evidence from the defense in violation of *Brady v. Maryland*, *supra*.  The state provided a supplemental report correcting erroneous police work on the part of the investigating officer, prior to the trial.  Further, Dyas' complaint is immaterial.  Det. Belle was thoroughly cross-examined regarding the supplement and his entire involvement in the investigation and supplemental report.  Further, as noted above, the victim's testimony alone is sufficient support the conviction.  As explained herein, with regard to allegations relating to Det. Belle's police work and vaginal intercourse, there is no reasonable probability that the result of the proceeding would have been different.  This assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, Dyas' conviction and sentence are affirmed.

**AFFIRMED.**